IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| UNITED STATES OF AMERICA | ) | Criminal Number: 2:20-527 |
|---|---|---|
| | ) | |
| | ) | |
| -versus- | ) | SENTENCING MEMORANDUM |
| | ) | |
| | ) | |
| ABRAHAM JENKINS | ) | |

May 31 did not start with a formal plan. There was no meeting of an organization. There was a sense of urgency. Of grief. Of exhaustion. Of anger.

When Abraham "AJ" Jenkins headed down to Marion Square, he expected to see hundreds or thousands protesting the violent, extra-judicial killing of George Floyd. But as he walked through the crowd, he saw lackluster energy. Chants that faded out. A lack of focus. He wanted to catalyze what he saw as a complacent, disorganized group. He jumped atop a parked Mount Pleasant police cruiser, stomping, yelling, leading chants. He knew he was taking a risk, openly damaging a police vehicle. But he felt it was a risk worth taking to draw attention to the pervasive problem of extrajudicial killings of black people in America. In Minneapolis. In Baltimore. In Atlanta. In Charleston.

As the afternoon gave way to evening, AJ and other protesters, who had gathered organically, as so many thousands of others had in cities all over the United States—galvanized by the images of two men, George Floyd and Derek Chauvin, whose destinies

became forever linked by the relaxed ease with which Chauvin snuffed Floyd's life out—made their way around the city. For much of the evening, the protesters and the police engaged each other politely, if warily. It was not until late in the evening when Charleston Police began to march through the streets to press protesters into smaller and smaller areas of the city that the protesters, including AJ, began to escalate their tactics.

Pushed into the area near Market between East Bay and Meeting Streets, AJ and others taunted officers whom they felt were unnecessarily and unsafely "kettling" them to limit their movement and cut off their ability to maneuver. AJ admitted to spraying a fire extinguisher toward one group of officers and later throwing the fire extinguisher toward another group of officers. As the protesters were pushed back up Meeting Street, AJ's anger was bubbling over. Moving up Hassell Street, he saw a makeshift Molotov cocktail—little more than a flaming rag—lying aflame on top a CPD cruiser; he picked it up and threw it into the car, catching the car on fire. Not long after, he left the area and went home.

When asked by law enforcement after the fact about his actions, AJ did not try to minimize what he had done. He did make it clear that he had not engaged in the looting of any businesses, as his complaint was against the police, not local store owners or restauranteurs.

AJ did what he did aware of the fact there are consequences to be paid. He comes before this court seeking a sentence that properly balances those consequences against the incredible tumult, the overwhelming unfairness, and the understandable grief and

rage that gave rise to his actions on May 31. This Court should also weigh the fact that AJ is still facing charges in the Ninth Judicial Circuit arising out that night and that nothing that happens in the federal case will bind the State of South Carolina to abandon those charges or to resolve them similarly. His future will remain uncertain no matter what this Court does.

The events of May 2020 and January 2021 paint a picture in stark relief; the contrasts between the two groups, their strategies, their tactics, and their motivations could not be clearer. Here, Congress' admonition that judges should avoid unwarranted sentencing disparities seems particularly apt. Whatever their tactics, people like AJ were moved to protest in response the seemingly intractable problem of police violence against people of color. The motivation of people who stormed the Capitol on January 6 was to overturn a lawful election, the results of which they disliked. And yet at least 44% of all Capitol insurgents have been charged with federal misdemeanors.[1] While the conduct necessarily informs the consequence, surely, so must the intent.

Any person with a sense of justice and propriety can assess the statistics and conclude that too many people—and especially too many black people—in America die at the ends of encounters with police. If the efforts of AJ and others like him veered away from what is acceptable in the face of such injustice, the consequence of having been arrested and his movements restricted and monitored for over a year should suffice,

---

[1] Tom Jackman and Spencer S. Hsu, *Hundreds of people stormed the Capitol. Most won't face hefty prison terms, legal experts say.* Washington Post, May 13, 2021. (available at https://www.washingtonpost.com/nation/2021/05/13/capitol-rioters-sentencing/).

particularly when the uncertain specter of further prosecution looms. A custodial sentence is unnecessary to protect the public. Over the last year AJ's has been quieted and contained; though he remains committed to the cause of justice, committed to the principle that Black Lives Matter, he has abided by the terms of his bond and has refrained from participating in further protests. But justice—for George Floyd and countless others like him—that AJ took to the streets to demand on May 31 is the only antidote to further unrest, not a prison sentence for one person's participation in the destruction of public property or a single night of disorder.

Moreover, as the enclosed letters of support demonstrate, neither that one night, nor AJ's previous legal troubles define him. (Exhibit A – Letters of Support) Galvanized to act after the mass shooting at a North Charleston concert in May, AJ has started working as an assistant football coach and has started a mentoring group to help guide young men who are growing up amidst continued racial inequity, continued community violence, and continued economic instability. As a young father, he is working to be a part of lifting young people in his community up so they will not make some of the same missteps he has. He has shown drive, determination, and creativity in pursuing these goals despite his past challenges. This Court should fashion a sentence that encourages rather than limits these concrete efforts.

        BLAZER LAW FIRM
        1037 Chuck Dawley Blvd D100
        Mount Pleasant, SC 29464
        Telephone: (843) 732-4441

By:    */s/ Cameron Jane Blazer*
       Cameron Jane Blazer
       Federal ID Number: 10131

Attorney for Defendant

Charleston, South Carolina
July 6, 2021